

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM CURTIS HILL JR. and<br>CHRISTINE JEAN REILING,<br><br>Defendants. | CR 19-109-BLG-SPW<br><br><br>ORDER DENYING<br>DEFENDANT'S MOTION<br>TO SUPPRESS |

Before the Court is Defendant William Curtis Hill Jr.'s (William) Motion to Suppress Evidence. (Doc. 31.) William's co-defendant, Christine Jean Reiling (Christine), has joined him in his motion. (Doc. 36.) On December 20, 2019, the Court held a hearing on the motion. For the following reasons, the Court denies it.

I. Background

On February 22, 2019, Montana Violent Offender Task Force Officer Brandon Smart was searching for Steven Hill (Steven), William's brother, who had an outstanding felony warrant. (Doc. 34 at 2.) He began surveilling William and Christine's residence in Ballantyne after receiving information that Steven could be hiding there. (*Id.*) He would later testify that he had encountered the brothers before,

1

and William had previously hidden Steven from him. Both William and Christine were on probation with the state of Montana at the time.

Officer Smart observed a 2007 Ford Escape parked outside the residence. (*Id.*) He ran the plates on the vehicle and discovered they were registered to a 1998 GMC Sierra. (*Id.*) In his training and experience, false plates on a vehicle could indicate it was stolen.

Officer Smart watched William exit the residence and enter the vehicle. After a time, he believed he observed Steven exit the residence and join William in the vehicle. (*Id.*) He observed who he believed to be Steven walk between the residence and vehicle on two occasions. Officer Smart requested other Task Force officers to respond and assist him in arresting Steven. Six other officers responded, including Montana State Probation Officer Amanda Reede. Officer Smart gave the order to move in. Officer Smart called William out of the vehicle but found Steven was not in it. (*Id.*) The officers initially had their weapons drawn while calling William out of the vehicle but holstered them soon after William came out and approached them.

Officer Smart and Officer Steve Swanson asked William where Steven was, and William said he was not there. Officer Smart told William he had just seen Steven. William responded that Officer Smart must have mistaken him for Steven. Officer Smart asked who else was in the house, and William said his girlfriend was. While the officers were asking William about Steven, William's dog began barking

frantically. Officers Smart and Swanson permitted William to go back inside with his dog to get a leash.

When William returned with his dog on a leash, Christine came outside with him. Officer Smart asked her where Steven was. She said he was not there. Then, according to Officer Smart and Officer Reede, either William or Christine or both told the officers to go inside and search for Steven. William later testified neither he nor Christine told the officers to go inside.

Officers Swanson and Patrick Schally conducted a preliminary search and clear of the residence. The officers then conducted a more thorough secondary search, where they looked in more discrete areas a person could potentially hide. During the secondary search, the officers noticed some loose wall paneling concealing a crown royal bag. They also noticed some of the carpet in one of the bedrooms was unsecure and had irregular depressions under it. Based on their training and experience, they believed there could have been a trapdoor under the carpet that would have allowed someone to escape underneath the trailer. The officers pulled back the carpet where it was unsecure, but instead of a trapdoor, they found a baggie containing a white crystalline substance they concluded was likely methamphetamine.

Because the baggie containing suspected methamphetamine violated the terms of William and Christine's probation, State Probation Officer Reede

authorized a probationary search of the residence. Officer Swanson remained outside with William and Christine while his team performed the probationary search. Officer Swanson, who had several prior amicable encounters with William, testified William was at ease and made jokes about Officer Swanson's likeness to a fictional character.

Meanwhile, no longer searching for Steven, officers inside the trailer searched for drugs and drug paraphernalia. They recovered several items. William and Christine were later charged with conspiracy to possess with intent to distribute methamphetamine and possession with intent to distribute methamphetamine. (Doc. 1.)

## II. Discussion

### 1. Consent to Search the Residence

"A warrantless search is unconstitutional unless the government demonstrates that it 'fall[s] within certain established and well-defined exceptions to the warrant clause.'" *United States v. Brown*, 563 F.3d 410, 414 (9th Cir. 2009) (quoting *United States v. Murphy*, 516 F.3d 1117, 1120 (9th Cir. 2008)). One such exception is valid consent. *Id.*; *see Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

While the parties' versions of events differ, the Court finds the Government has met its burden. It has demonstrated William and Christine consented to a search of their residence.

Officer Smart testified that after Christine said Steven was not in the residence, she told officers they could go inside to look for him. Officer Smart then informed William and Christine that if Steven was in the residence, and if they were hiding him, they could be criminally charged. William and Christine assured him Steven was not in the residence and once again said the officers could go inside and look for him.

Officer Amanda Reede testified she was stationed nearby behind a corner of the residence. Officer Reede was not watching Officer Smart speak with William and Christine because she was on the lookout for activity in the backyard, but she was approximately ten feet away and could overhear their conversation. Officer Reede testified she overheard Officer Smart ask William and Christine where Steven was. She recalls one of the two saying Steven was not in the residence. Then, Officer Smart pressed them and told the couple he saw Steven earlier. Officer Reede remembers one or both of the couple saying "he's not fucking here—go fucking look." Officer Smart then reminded William and Christine they could be charged with obstruction if Steven was, in fact, in the residence. According to Officer Reede, their response was, "he's not fucking in there—go ahead."

William Hill, however, testified he had never had contact with Officer Smart before February 22, 2019. He testified that after the officers told him they saw Steven exit the residence earlier, he said Steven was "not fucking here." He testified

the officers told him that if he was lying, he'd receive new charges. He further testified, however, that neither he nor Christine ever told the officers to enter the residence to search for Steven.

The Court finds the officers' testimony to be more credible. William, Officer Smart, and Officer Reede all testified to William denying Steven was in the residence. All three testified that the officers informed William he could receive additional charges if he was lying. However, while William denied it, Officer Smart and Officer Reede both recalled William and Christine affirmatively telling officers to enter their residence to search for Steven. While on the witness stand, Officer Reede said she could vividly recall the exact language William and Christine used concerning Steven—"he's not fucking here—go fucking look," and "he's not fucking in there—go ahead." Officer Smart testified that Christine told them to enter the house to search for Steven, and after he reminded William and Christine of the consequences if Steven was hiding in there, both William and Christine reiterated that the officers should go inside to look. The Court finds William and Christine verbally consented to a search of their residence.

*2. Voluntariness of the Consent to Search*

In addition to proving consent was given, the Government bears the burden of establishing it was voluntary. *Schneckloth*, 412 U.S. at 222. Voluntariness "is a question of fact to be determined from the totality of all the circumstances." *Id.* at

227. The Ninth Circuit has identified five factors courts should consider when determining the voluntariness of a consent to search: "(1) whether [the] defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004). No one factor is determinative, and it is not necessary to meet all five. *Id.* Moreover, the factors "are only guideposts," and the full scope of the circumstances of each encounter should be considered. *Id.*

First, whether a defendant was in custody depends on whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *United States v. Kim*, 292 F.3d 969, 973–74 (9th Cir. 2002) (quoting *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987), *modified* 830 F.2d 127 (9th Cir. 1987)). William was ordered from his vehicle, but officers were initially unconcerned about his actions. Instead, they immediately began questioning him about Steven's whereabouts. At one point during the encounter, William was permitted to go inside his house to retrieve a leash for his dog. Neither he nor Christine were placed in handcuffs. Officer Swanson testified William was at ease and bantering back and forth with him because the two knew each other from prior encounters. Officer Smart testified William and Christine were free to leave

7

since the officers were only concerned with Steven. Accordingly, although William and Christine were made to wait outside their trailer during the search, they both knew they were not the object of the investigation, and a reasonable person would have believed he or she was free to leave in these circumstances. Therefore, William and Christine were not in custody. This factor weighs in favor of the Government.

Second, William testified the officers initially had their guns drawn but that they holstered the guns after they began speaking with him about Steven. By the time William and Christine said the officers could enter the house to search for Steven, the officers' weapons had been holstered for several minutes. This factor weighs in favor of the Government.

Third, Miranda warnings were unnecessary because William and Christine were not in custody. This factor is neutral.

Fourth, there is no evidence William and Christine were notified they had a right not to consent. William testified he was not notified. This factor weighs in favor of William and Christine.

The application of the fifth factor "hinges on whether a suspect is informed about the possibility of a search warrant in a threatening manner." *Patayan Soriano*, 361 F.3d at 504 (internal quotations omitted). Here, there is no evidence the officers told William and Christine they could apply for a warrant whatsoever. This factor weighs in favor of the Government.

Finally, the Court notes that the officers never asked William or Christine for consent to search their trailer. Rather, William and Christine themselves told the officers to enter their home and look for Steven, presumably to dispel the officers' suspicion of his hiding there. Because the officers never asked for consent to search the trailer before William and Christine told them to do so, it is far less likely their consent was coerced. This fact weighs considerably in favor of finding the couple's consent was voluntary.

Three factors weigh in favor of the Government; one weighs in favor of William and Christine. William and Christine also told the officers to enter their home to look for Steven. Their consent was voluntarily and freely given.

*3. Reasonableness of the Three Searches*

William and Christine next take issue with the reasonableness of each search. Specifically, they take issue with the fact that officers looked behind wall paneling and pulled up loose carpeting when looking for Steven.

When officers receive consent to search, the search is limited by the scope of the consent. *United States v. Gutierrez-Mederos*, 965 F.2d 800, 803 (9th Cir. 1992). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Fla. v. Jimeno*, 500 U.S. 248, 251 (1991). The question before the Court,

then, is whether it was reasonable for the officers to consider William and Christine's consent to search their home for Steven to include consent to examine areas underneath unsecured carpeting and behind wall paneling. *See id.* The Court concludes it was.

Three searches occurred. The first was a general protective sweep of the open areas of the trailer for Steven. The second was a more detailed search in enclosed spaces and other discrete areas Steven could have been hiding. The third search occurred after officers discovered a baggie of suspected methamphetamine; it was a detailed, thorough, probationary search for drugs and drug paraphernalia.

Officers Reede, Schally, and Swanson all testified that the standard procedure when searching for a person is to conduct two searches: the first, a general protective search of the open areas of a home; the second, a detailed search of potential hiding places. The testimony from the officers and the Government's exhibits indicate there was unsecured wall paneling and carpeting in the trailer. In particular, the carpet in the trailer's back bedroom (where officers discovered the baggie of methamphetamine) had irregular depressions in it, was unsecured to the floor, and had what multiple officers described as a spongy feel while walking on it. Officer Swanson testified he had previously found suspects in refrigerators, box springs, cabinets, trunks, under trapdoors, and even inside of walls. Officers Swanson and Schally testified that upon noticing the nature of the carpet in the back bedroom,

they suspected a trapdoor could exist that would have allowed somebody to escape underneath the trailer.

Searching these areas was not unreasonable. A reasonable person in William and Christine's position would have understood the scope of their consent to extend to the open areas of their home and hiding places Steven could reasonably have been found. When officers noticed the loose, disturbed wall paneling, it was reasonable for them to look behind it for Steven. When officers noticed the unsecured, irregular carpeting, it was reasonable for them to pull it back in search of a trapdoor. Neither the first nor the second search exceeded the scope of William and Christine's consent. Neither was unreasonable.

The third search was also not unreasonable. A probationary search executed pursuant to a condition included in terms of probation must still meet the Fourth Amendment's standard of reasonableness. *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016). One of William's conditions provides that, "upon reasonable suspicion that the Defendant has violated the conditions of supervision, a probation and parole officer may search the person, vehicle, and residence of the Defendant . . . ." (Doc. 32 at 11.) Once officers discovered the baggie of suspected methamphetamine, there is little doubt it gave them reasonable suspicion that William was violating his conditions of supervision. The officers were justified in

searching the residence for additional drugs and drug paraphernalia. Accordingly, all three searches were reasonable under the Fourth Amendment.

### III. Conclusion

William and Christine told officers to enter their home and search for Steven. Their consent was voluntarily and freely given. The officers did not exceed the scope of that consent while searching the home, even when they looked for Steven behind a loose wall panel and pulled up unsecured carpeting to search for a potential trapdoor. When officers discovered a baggie of suspected methamphetamine while searching under the carpet, they were justified in conducting a probationary search, as they had reasonable suspicion William had violated the conditions of his supervision. Accordingly,

**IT IS ORDERED** that the Defendant William Curtis Hill Jr.'s Motion to Suppress Evidence (Doc. 31) is **DENIED**.

DATED this 24th day of January, 2020.

SUSAN P. WATTERS
United States District Judge